Vol. 104.]       SEPTEMBER TERM, 1898.            781

Grant, Assgn. of Southern Contract Co. v. Southern Contract Co., etc.

CASE 105—ACTION AGAINST STOCKHOLDERS OF INSOLVENT
CORPORATIONS—NOVEMBER 29.

104  781
Case 1
s119  707

# Grant, Assignee of Southern Contract Co. v. Southern Contract Co., Etc.
# Mason, Gooch & Hoge Co. v. Southern Contract Co., Etc.
# G. W. Wady & Co. v. Southern Contract Co., Etc.
# Jackson & Sharp Co. v. Southern Contract Co., Etc.

APPEAL FROM JEFFERSON CIRCUIT COURT, LAW AND EQUITY DIVISION.

CORPORATIONS—LIABILITY OF STOCKHOLDERS—DIVIDENDS BY INSOL-
VENT CORPORATIONS.—A railroad construction company being
largely indebted to sub-contractors and others, made a con-
tract with a railroad company for the construction of an ex-
tension of its line of road upon the agreed consideration
of $1,500,000 in bonds and $1,000,000 stock of the rail-
road company. Bonds to the amount of $150,000 were
advanced by the railroad company upon this contract
and were immediately distributed to the stockholders of
the construction company, making a dividend of 120 per
cent. upon the capital stock of the construction company.
This action was instituted by the creditors of the construction
company against the stockholders of the company to make
them liable for the debts of the company to the extent of the
dividend received by them. To this action the defense was in-
terposed that the distribution of $150,000 of bonds to the stock-
holders was upon a valuable consideration, to-wit: That the
stockholders would assist in floating the securities of the rail-
road company. It is held by the court (1) that the distribution
of $150,000 in bonds was a dividend and not a sale of bonds
to the stockholders upon a valuable consideration; and (2), that
the dividend being thus declared when the construction com-
pany was insolvent, the stockholders are liable to the cred-
itors of the construction company to the extent of the dividends
thus declared.

Grant, Assgn. of Southern Contract Co. v. Southern Contract Co., etc.

WILLIAM MARSHALL BULLITT FOR APPELLANT GRANT, ASSIGNEE.
(ST. JOHN BOYLE, BULLITT & SHEILD OF COUNSEL.)

1. A distribution of corporate assets among stockholders, leaving corporate debts unpaid, may be recovered back by creditors. (a.) Assets of a corporation can not be parcelled out among its stockholders when there are no net earnings to divide. Union Natl. Bank v. Douglass, 1 McCrary, 86; Gratz v. Redd, 4 B. Mon., 178; Hamar v. Taylor-Rice Co., 84 F. R., 392; Crandall v. Lincoln, 52 Conn., 73; Williams v. Boice, 38 N. J. Eq., 364; Lockhart v. Van Alstyne, 18 Am. Rep., 156; Chaffee v. Rutland R. R. Co., 16 Am. & Eng. R. R. Cases, 408; Elkins v. Camden R. R. Co., 36 N. J. Eq., 233; McGregor v. Home Ins. Co., 33 N. J. Eq., 181; R. R. Co. v. Howard, 7 Wall., 392; Morawetz on Corporations (2d ed.), secs. 435, 789, 790. (b.) The distribution of the bonds rendered the Southern Contract Company insolvent.

2. The bonds were not acquired by the stockholders for value from the Louisville Southern R. R. Co., but were acquired as a distribution of the assets of the Southern Contract Company among its stockholders.

3. There was no contract between the Southern Contract Company and its stockholders whereby the former agreed to distribute the bonds if the latter would subscribe for $500,000 of other bonds. (a.) There is no such contract pleaded. (b.) That character of contract could only be made by the board of directors acting as a board. American, &c., Co. v. Gedge, 96 Ky., 513; R. R. Co. v. Burns, 92 Ill., 302; Baldwin v. Caufield, 26 Minn., 43; Turnpike Co. v. Craver, 45 Pa. St., 386. (c.) The evidence fails to show any promise whatever on the part of the Southern Contract Company.

WILLIAM LINDSAY, FOR APPELLANTS, MASON, GOOCH & HOGE CO., JACKSON & SHARP CO., AND GEORGE W. WADY & CO. (STONE & SUDDUTH, G. WEISSINGER SMITH, OF COUNSEL.)

1. There was no contract, or, in the language of the witness, Grant, "there was no pledge."

2. The supposed contract was not plead by any party to this litigation.

3. The supposed contract was not only not proved, but its existence was overwhelmingly disproved.

4. A contract which will admit of the construction accepted and

Grant, Assgn. of Southern Contract Co. v. Southern Contract Co., etc.

enforced by a chancellor, is against good morals and public policy, and is void.

Citations: L. L. F. & M. Ins. Co. v. Page & Richardson, 17 B. M., 350; Morawetz on Corporations, sec. 345; Lockhart v. Van Alstyne, 31 Mich., 76; Bryant v. Bryant, 14 Ky. Law Rep., 358; Rothchild v. Kahn, 14 Ky. Law Rep., 36.

GEORGE WEISSINGER SMITH AND STONE & SUDDUTH, ALSO FOR APPELLANTS, GEORGE W. WADY & CO., MASON, GOOCH & HOGE CO., AND JACKSON & SHARP CO. (WILLIAM LINDSAY, OF COUNSEL.)

1. In a court of justice stockholders can not successfully maintain the claim that they have a right to distribute among themselves bonds or other property which they have acquired by bartering away all of its capital stock, whatever form it may assume, thereby depriving their creditors, who nourish the company with their own labor and funds, of all means of recovering their just dues. Thompson on Corporations, secs. 1573, 2951, 2953, 3786, 3787; Gratz v. Redd, 4 B. M., 178; Cook On Stockholders, secs. 199, 200, 225, 193, 194; Dudley v. Price's Admr., 10 B. M., 86-87; Handley v. Stutz, 139 U. S., 417; Story's Eq. Jur., 322; Smith's Exrs. v. Vertrees, 2 Bush, 64; Miers v. Zanesville, &c., 13 O., 197; Sawyer v. Hoag, 17 Wallace, 610.

RICHARDS, BASKIN & RONALD, FOR JACKSON & SHARP Co.
(No brief in the record.)

SWAGER SHERLEY FOR APPELLEES. (WM. S. PRYOR, STROTHER & GORDON, AND ARTHUR PETER, JR., OF COUNSEL.)

1. The bonds distributed among the Southern Contract Company's stockholders never were assets of that company, but were distributed by the Contract Company in pursuance of a contract made with its stockholders and the Louisville Southern Railroad company, and were delivered by the Railroad Company to the Contract Company for the express purpose of such distribution.

2. Even if assets of the Contract Company, the bonds were distributed by it as a "going concern" in good faith, to save itself from total failure and insolvency. Handley v. Stutz, 139 U. S., 417.

2. The Contract Company was solvent after the making of this

784          KENTUCKY REPORTS.          [Vol. 104.

Grant, Assgn. of Southern Contract Co. v. Southern Contract Co., etc.

distribution and able to pay all its indebtedness, and consequently there is no liability on the stockholders to return the bonds, even though declared as a dividend. (a.) The capital stock of a corporation, paid and unpaid, its assets of any and every kind are all its property in the same way and subject to the same rights and obligations. Sanger v. Upton, 91 U. S., 56; Morgan County v. Allen, 103 U. S., 508; Hospes v. Northwestern Mfg. & Car. Co., 48 Minn., 174. (b.) A corporation holds its property in the same way that an individual does, with the same rights of control and disposition. The "trust fund" doctrine repudiated. Graham v. Railroad Co., 102 U. S., 148; Hospes v. Northwestern Mfg. & Car Co., *supra;* Hollins v. Brierfield Coal & Iron Co., 150 U. S., 381; Louisville Banking Co. v. Etheridge Mfg. Co., 19 Ky. Law Rep., 908; 23 C. C. A. Reports, foot note, 315. (c.) The Kentucky statute against voluntary conveyances does not apply. Thompson on Corporation, vol. 3, sec. 2962.

STROTHER & GORDON FOR APPELLEES, J. M. ROBINSON'S EXRS.

1. The agreement that the stockholders of the Construction Company should have $150,000 of bonds of the Lexington extension was in consideration that the stockholders should subscribe or procure subscriptions to $500,000 par value of these Lexington extension bonds. These bonds were never assets, therefore, of the Construction Company. Handley v. Stutz, 139 U. S., 417.

2. As to J. M. Robinson's executors, none of these actions were revived within the time prescribed by law. Civ. Code, secs. 510, 501, 507, 508; Thompson's Admr. v. Williams, 86 Ky., 19.

3. The amended petition filed October. 29, 1895, does not state a cause of action as to the executors of J. M. Robinson. No revivor having been had, the allegations of the original petition could not be made effective against the said personal representatives. Day v. Renaker, 14 Ky. Law Rep., 923.

4. The plea of statute of limitations is good and ought to have been sustained. Brown v. Brown, 91 Ky., 639; Hayden v. Thompson, 71 Fed. Rep., 60.

SWAGER SHERLEY IN A SUPPLEMENTAL BRIEF.

1. The answer of one defendant is not evidence against another. Long & Co. v. Kerrington, 13 Ky. Law Rep., 433; Crane v. Gunn, 4 B. M., 15.

2. Parol evidence is permissible to show contemporaneous agree-

Grant, Assgn. of Southern Contract Co. v. Southern Contract Co., etc.

ment collateral to a written contract. Duncan v. Sheehan, 13 Ky. Law Rep., 780; Heinig v. Burnett & Co., 13 Ky. Law Rep., 969; Bush v. Robinson, 16 Ky. Law Rep., 226.

3. The Contract Company and the Railroad Company ratified the action of Colonel Young and the promise made by him by accepting after knowledge the subscriptions procured by the stockholders.    Thompson on Corporations, vol. 4, secs. 4946, 5258, 5303.

SWAGER SHERLEY FOR APPELLEES IN A PETITION FOR A REHEARING.    (WM. S. PRYOR OF COUNSEL.)

1. The distribution of bonds was not a dividend.
2. There is written evidence of a contract by which these bonds were distributed.
3. The delivery of the $150,000 of bonds was not to cancel an existing indebtedness of the railroad company to the construction company.
4. No defendant, except those who would gain more by losing the suit than by winning, have ever admitted plaintiff's allegations.
5. The unequal amounts of the stockholders' subscriptions for the securities of the Lexington extension does not negative the contention of the defendants.
6. The defendants are not estopped by the allegation made by some of them that the corporation was solvent when the distribution was made from setting up the defense not sought to be relied on.
7. It was no fraud upon the outside subscribers of bonds that some of the bonds were distributed as a bonus.
8. The position asserted by the court that stockholders subscribed believing in the success of the plan and not relying on any promise, is negatived by the testimony of every stockholder who testified at all.

JUDGE HAZELRIGG DELIVERED THE OPINION OF THE COURT.

The Southern Contract Company was incorporated under the laws of Kentucky, with power and authority to construct railways in the State, and receive in payment thereon the stocks and bonds of such railroad companies. Its capital stock was only $125,000, and the shares of $100 each were owned by some one hundred persons.  Its chief

[ 50 ]

means to carry out the purpose of its incorporation consisted necessarily in the proceeds of the stock and bonds of the railroads to be built by it. Under contract with the Louisville Railroad Company, by which it obtained possession of the mortgage bonds and certain stocks of the company, the Contract Company built the Louisville Southern Railroad, from Louisville to Burgin, in Mercer county, completing the work during the summer of 1888. Subsequently it furnished certain moneys for repairs on the road, and, in the latter part of the year named, the railroad company was in debt to the contract company in the sum of about $300,000. The contract company at this time was indebted to various contractors for work on the line thus completed. Whilst matters were in this condition, it was determined to extend the road from Lawrenceburg on to Lexington, Ky., and the railroad company agreed to turn over to the contract company its bonds, secured by mortgage on the proposed extension, to the amount of $1,500,000, and of its capital stock to the extent of $1,000,000. The bonds were to be delivered as the work progressed, except that $150,000 of them were to be delivered at once, as shown by the ninth clause of the contract, which reads as follows: "On account of the existing indebtedness of the railroad company to the contract company, the latter should be entitled at once to receive delivery of $150,000 of the bonds of the said railroad company." And it was further provided that the contract company should then release the railroad company of all its indebtedness against it. In accordance with the contract, the bonds were delivered to the contract company as the work progressed, and were, in turn, pledged or sold by the contract company, to raise the money for building the extension; but, in accordance with

Vol. 104].     SEPTEMBER TERM, 1898.     **787**

Grant, Assgn. of Southern Contract Co. v. Southern Contract Co., etc.

what seems to have been the understanding among all the parties, the bonds for immediate delivery were so delivered to the contract company and at once distributed among the stockholders of the contract company as a dividend of one hundred and twenty per cent. on the capital stock of that company.

As the cost of the extension was estimated at $900,000, it is clear that all the parties interested expected the contract company to make a large profit; and it was believed the company might safely declare, not only this dividend of one hundred and twenty per cent., but, as expressed by one of the best informed witnesses, it was expected that the company would be able to declare an additional dividend of one hundred per cent. in a short time. The initiatory step, however, to insure success, was to place the bonds of the railroad company, and it was understood that the contract company and its stockholders would place at least $500,000 of these bonds. It did sell bonds to the extent of $640,000, of which amount the stockholders of the contract company took $423,000, and $217,000 of them were taken by outsiders. The terms of subscription for these bonds were that the subscriber got a $1,000 bond and $850 of stock for the sum of $850, payable in installments. The remaining bonds were pledged to various financial institutions of the country, and large sums realized, by means of which the extension was pushed to completion. In the meantime, the debts due to certain contractors for work on the completed line remained unpaid; and in July, 1892, the Mason, Gooch & Hoge Company. after judgment against the contract company and a return of "no property found," instituted its action in equity to compel the stockholders of the contract company to refund the dividend they had received; its principal averment being that, after the debts

788        KENTUCKY REPORTS.        [Vol. 104.

Grant, Assgn: of Southern Contract Co. v. Southern Contract Co., etc.

upon which said judgment in its favor was rendered were created, the stockholders in said corporation (contract company) withdrew, and divided among themselves the capital stock and assets of said corporation in a larger amount than the plaintiff's said debts, and it avers it has a right to have said stock and assets of said corporation applied to the payment of its judgment aforesaid. Other suits of a similar character followed,; and these complaining creditors of the contract company are the appellants in this court, the chancellor having denied them any relief, upon grounds to be considered presently.

At the outset, we are to keep in mind that under the general law, nowhere more clearly recognized than in this State, the contract company, whether solvent or insolvent, could not distribute among its stockholders the full amountof its capital stock, and its entire assets to the detriment of its creditors. In Gratz v. Redd, 4 B. Mon., 178, it was held that the capital stock of a corporation was a fund set apart by the charter for the specific purposes of the incorporation and all creditors have the right to look to this fund for the payment of their debts. The court said the creditors "have an interest in and claim upon the fund set apart by law for their payment, and may follow it into the hands of the distributees, who hold it as volunteer recipients, having no rightful claim upon it." We assume it to be well-settled law that the stockholders of a corporation can not pay up their stock, and then appropriate to themselves an equal amount of the assets of the corporation, without making provision for the payment of the corporate debts. Whatever may have been the views of the stockholders at the time of this declaration of dividend and receipt of it by them, and at the time they filed their original answers in these suits, as to these general

principles of the law, they do not now seem to seriously
call them in question; but they rest their defense chiefly
on the contention that the bonds thus distributed were
never, in fact, assets of the contract company, but were
distributed to the stockholders as a bonus by the rail--
way company in consideration of the fact, and in
pursuance of a contract to the effect, that the stock--
holders of the contract company would subscribe for $500,-
000 of the extension bonds of the railroad company. Mani-
festly, if such was the consideration of the distribution of '
these bonds among these stockholders, the distribution
ought not to have been called, as it is called in every or-
der and resolution connected with the subject, a *"divi-
dend."* There could be no greater abuse of the use of or-
dinarily well understood terms than to call that a *divi-
dend* among the stockholders of the corporation which was
in fact a distribution for a valuable consideration of as-
sets and bonds of a totally different company; but, if we
waive this misuse of the words employed to turn over to
these stockholders the bonds of the railroad company, we
should at least expect to find some written evidence of so
important a transaction, or some unequivocal resolution
of the governing authorities of the railway corporation or ·
the contract company acting on behalf of its stockholders;
and least of all should we expect to find, in the deliberate
and carefully prepared contract between the contract com-
pany and the railroad company, stipulations with re-
spect to these bonds to be immediately delivered, which·
are wholly *inconsistent* with the present contention of the
stockholders that these bonds were distributed as a bonus
to them, and because of their pledge to subscribe for other
bonds of the railroad. We do find, however, that the
purpose of this immediate delivery of the bonds in dispute

is distinctly set up in the contract between the contract and railroad companies, and that purpose is not different from and inconsistent with the present contention of the stockholders; but, as will be observed, the delivery of these bonds canceled in express terms a debt due the contract company from the railroad company of some $300,000, and thus the creditors of the contract company were deprived of an asset due their debtor, and with which their debts might have been paid. It may be the asset was supposed to be worthless; still, even the chance of collecting it was cut off by its cancellation and release. We do not doubt that it was good business sagacity to thus cancel the debt against the railroad company, but only because the contract company received bonds of value therefor, and these bonds stood in the place of the debt the railroad company owed the contract company, and their proceeds ought to have gone to pay the debts of the contract company. Moreover, if this important transaction, involving the distribution of these bonds among the stockholders of this company, was had for the reasons now assigned, we should expect to find substantial unanimity among the stockholders themselves respecting the controlling reasons which induced the distribution; and especially would we expect to find the stockholders, when sued for the dividends thus declared by the contract company and received by them, promptly and consistently asserting the defense that the distribution was not in fact a dividend or distribution of assets belonging to the contract company.

The facts are, however, that when sued in July, 1892, the various stockholders began filing separate answers, in which it was distinctly admitted that the contract company had declared a dividend of one hundred and twenty per cent. on its capital stock, and the same had been dis-

Vol. 104].  SEPTEMBER TERM, 1898.  791

Grant, Assgn. of Southern Contract Co. v. Southern Contract Co., etc.

tributed among the stockholders, not in cash, but in the form of first mortgage bonds of the Louisville Southern Railroad Company. . Some of these defendants averred that the contract company was entirely solvent at the time, and had the right to declare and pay this dividend. Others admitted substantially the claim of the plaintiffs, and took steps to bring all the stockholders before the court, to the end that all might bear the loss ratably. Still others set up that the stockholders had become bound as indorsers and otherwise on certain paper of the contract company, and had paid off the debt, and the company owed them more than the dividend. Among the stockholders whose answer in express terms admitted that the distribution of these bonds was a dividend declared on its capital stock by the contract company are to be found those principally interested in the railroad company and in the contract company, and whose holdings of stock were the largest, and who were most active and prominent in the promotion of the enterprise. And in none of these answers are we informed of what is now conceded to be the real and only defense to these suits. Not until 1894, by their amended answers, are we given a hint of this important claim that the stockholders were induced to subscribe for the extension bonds by reason of the gift to them by the railroad of the bonds in dispute. It may be noticed here, too, that, if the railroad was making such a gift for the purpose of inducing such subscription, the gift would naturally have been made only to such stockholders as would, in fact, subscribe for the new bonds, and somewhat in proportion to their subscriptions; whereas we find that seventeen persons holding but $20,350 of the stock in the contract company, subscribed for $231,000 of bonds, one-half the amount taken by the stockholders;

and two persons holding $24,250 of stock in the contract company, did not subscribe for any bonds at all, although they received one-fifth of the entire $150,000 of bonds. And persons who held no stock at all subscribed, as we have seen, for $217,000 of bonds. Further inconsistencies might be pointed out in the various pleadings by the different defendants. It is true that some of the defendant stockholders may be interested in ignoring the defense asserted by other. When they have paid out for the company a greater sum than the dividend received, · they might get more if the plaintiffs succeed than if they fail. This, however, is problematical, and we can not attribute the differences in the various answers to such a motive; and, at any rate this does not account for the long delay in setting up the defense we have considered by those who were not bound on any of the company's paper, and who set up pleas wholly inconsistent with such defense. These pleas, as we have seen, for nearly two years of the litiga-' tion, quite freely admitted that these bonds were distributed by the contract company as a dividend among its stockholders. But this is not all. Even in 1895, and after the defense that the distribution had been made as a bonus had been set up, the appellees, among other things, said: "Defendants, and each of them, say that, immediately before the bonds were distributed among the stockholders of the contract company, the board of directors and stockholders of said company, made a thorough and careful examination of the financial condition of said company and said road, and said stockholders found thereby, as they believed and declared, that said company was perfectly solvent, and that it would have a large surplus of capital stock and assets over all liabilities after said distribution should be made; and, on ascertaining these

facts, the Southern Contract Company, by its stockholders, at a meeting thereof, regularly called and held just prior to said payment and distribution of said bonds as aforesaid, at which nearly all its members attended, and at which a large preponderance of the stock was represented by an almost unanimous vote, authorized and directed the directors to pay and distribute said funds as and for the purpose and for the consideration aforesaid. Wherefore these defendant plead and rely on said act of the stockholders of said company in authorizing and directing said payment and distribution of said bonds by said directors in bar of plaintiff's rights, as assignee of said company, to recover against these defendants," etc. These allegations were admitted by the appellants, were relied on by appellees as a defense on the previous appeal, and, only after this court held it unavailing as a defense, did they rely on the other alleged defense. (18 Ky. Law Rep., 598), [37 S. W., 263]. They are repeated even more explicitly to the effect that the bonds were assets of the contract company in an amended answer.

If these bonds were acquired by appellees in pursuance of a contract with the railroad company, by which their possession was obtained in view of an agreement to subscribe for the new bonds, there would have been no occasion for an examination into the condition of the contract company, as the solvency or insolvency of the company would have been wholly immaterial. Again, the defense now relied on is unreasonable in another respect. The scheme would, in effect, be that the railroad company sold to these stockholders $500,000 of its bonds, at the price of eighty-five cents so far as the public was to understand, but at only about fifty cents in fact, by reason of a rebate or gift to them of $150,000. And the sale of the

794 KENTUCKY REPORTS. [Vol. 104.

Grant, Assgn. of Southern Contract Co. v. Southern Contract Co., etc.

rest of the bonds was to be boosted by this trick on the part of men whose reputations and business capacity were so high as to make the bonds "go" on the general market. We do not believe these appellees were parties to such a scheme. These stockholders, as well as all the parties to this enterprise, had faith in its successful issue, and believed there were large gains to be had in the purchase of these bonds at eighty-five cents. It is true, they were promised by the directory of the contract company indirectly, if not in express terms, that, if they would take hold of the railroad bonds to the extent of $500,000, the success of the scheme would be assured, and the contract company would then be able to declare a dividend of one hundred and twenty per cent. on its capital stock, and in a short time even more than that. But at no time or place, nor at any meeting of the directory or stockholders, was this distribution called anything else than a dividend to the stock of the contract company.

At the first and most important meeting of the stockholders, and when the plan of extension was first unfolded, the minutes show as follows: "Col. Bennett H. Young stated that he was now neither a director nor an officer of the company, but had been asked to explain the condition of the company and the plans for an extension to Lexington by issuing $1,500,000 of bonds and $1,000,000 of stock on this new road; that in this way, it would be possible for the railroad company to repay to this company the large sums advanced to it by the company; that, if the plan was carried out, the directors *believed* they could pay a dividend of one hundred and twenty per cent. in the new bonds, and have from four hundred and fifty to six hundred per cent. in stock," etc. Later on, at a meeting of the directors of the contract company, it was resolved

as follows: "Whereas, it was understood at the stock-holders' meeting, held on December 13, 1888, that in consideration that the amount of $500,000 be subscribed to the bonds of the Louisville Southern Railroad, Lexington extension, a dividend of bonds shall be declared to the amount of $150,000 to the stock of the Southern Contract Company. Therefore, be it resolved, that the directors of the Louisville Southern Railroad be requested to order the trustee to deliver to the Southern Contract Company $150,000 in bonds at par value, in order that the Southern Contract Company may carry out the understanding at said meeting of stockholders." The understanding that a dividend would be declared in the bonds immediately delivered to the contract company was common to all the stockholders, and was founded on the promises made by the directors of the contract company, and which, in turn, was founded on the reasonable belief that the company was financially able to declare such a dividend. This promise or understanding is very far from indicating a contract with the railroad company, and is, at last, only such an understanding as is had when any corporation declares a dividend on its stock, and the stockholders accept it. There is necessarily an agreement between the directors and the stockholders. There is no evidence, however, that the railroad company undertook to demand, or even suggest that the contract company declare a dividend on its stock. This was a matter wholly foreign to its authority. The contract was to pay over these bonds in discharge of its indebtedness to the contract company; and this was plainly and unequivocally set up in the written contract.

We are of opinion that the plaintiffs ought to recover, but the question of amount against each stockholder has

not been submitted to or tried out by the chancellor.   The question of priority of lien by·creditors is not discussed, and it is sufficient to say, in answer to suggestion of counsel that this question be settled, that we see nothing to prevent the application of the ordinary and usual rules for determining the priorities of the liens of the attaching creditors.   The judgments dismissing the petitions are ·*reversed*, and judgments will be entered for the plaintiffs, in accordance with the principles of this opinion.